## Supreme Court, Appellate Division
## Third Judicial Department

Decided and Entered:  July 14, 2016                    106830
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                    Respondent,

            v                           MEMORANDUM AND ORDER

ANDRE WARD,
                    Appellant.
_____

Calendar Date:  May 31, 2016

Before:  Lahtinen, J.P., Egan Jr., Lynch, Devine and Mulvey, JJ.

_____

        Paul J. Connolly, Delmar, for appellant.

        Robert M. Carney, District Attorney, Schenectady (Peter H.
Willis of counsel), for respondent.

_____

Egan Jr., J.

        Appeal from a judgment of the County Court of Schenectady
County (Giardino, J.), rendered June 19, 2014, upon a verdict
convicting defendant of the crimes of predatory sexual assault,
criminal sexual act in the first degree, strangulation in the
second degree as a sexually motivated felony, criminal possession
of a weapon in the third degree, unlawful imprisonment in the
second degree and menacing in the second degree.

        Defendant was charged in a seven-count indictment with
predatory sexual assault, criminal sexual act in the first
degree, strangulation in the second degree as a sexually

motivated felony, assault in the second degree as a sexually
motivated felony, criminal possession of a weapon in the third
degree, unlawful imprisonment in the second degree and menacing
in the second degree.[1]  The charges stemmed from an incident that
occurred during the early morning hours of May 5, 2013 on
Brandywine Avenue between Union Street and Eastern Avenue in the
City of Schenectady, Schenectady County, at which time defendant
allegedly forcibly compelled the female victim to perform oral
sex on him and, in the course thereof, brandished a knife and
stabbed, choked and threatened to kill her.  A lengthy jury trial
ensued and, at the close of the People's case-in-chief, County
Court dismissed the assault count due to legally insufficient
evidence of physical injury.  The jury convicted defendant of the
remaining charges, and defendant thereafter was sentenced – in
the aggregate – to a prison term of 20 years to life.  Defendant
now appeals.

Defendant initially contends that his conviction of
strangulation in the second degree as a sexually motivated felony
is not supported by legally sufficient evidence and, further,
that the verdict as a whole is against the weight of the
evidence.  We disagree.  Insofar as is relevant here, "[a] person
is guilty of predatory sexual assault when he or she commits the
crime of . . . criminal sexual act in the first degree . . . and
when . . . [i]n the course of the commission of the crime or the
immediate flight therefrom, he or she . . . [u]ses or threatens
the immediate use of a dangerous instrument" (Penal Law § 130.95
[1] [b]; see People v Pena, 126 AD3d 618, 618-619 [2015], lv
granted 26 NY3d 1042 [2015]), such as a knife (see Penal Law
§ 10.00 [13]).  As to the underlying crime, "[a] person is guilty
of criminal sexual act in the first degree when he or she engages

_____

[1]  The indictment originally – and erroneously – charged
defendant with unlawful imprisonment in the third degree.  The
People thereafter realized the error, and County Court – with
defendant's consent – granted the People's motion to amend the
indictment.

in oral sexual conduct . . . with another person . . . [b]y forcible compulsion" (Penal Law § 130.50 [1]; see People v Simmons, 135 AD3d 1193, 1195 [2016], lv denied 27 NY3d 1006 [2016]).  To convict defendant of strangulation in the second degree as a sexually motivated felony, "the People were required to prove that he applied pressure to the throat or neck of the victim with the intent to impede her normal breathing or circulation of blood, and thereby caused her to suffer stupor or loss of consciousness for any period of time, or any other physical injury or impairment" (People v Peterson, 118 AD3d 1151, 1153 [2014], lvs denied 24 NY3d 1087 [2014]; see Penal Law §§ 121.11, 121.12) and, further, that he committed this particular offense (see Penal Law § 130.91 [2]) "for the purpose, in whole or substantial part, of his . . . direct sexual gratification" (Penal Law § 130.91 [1]).  Further, a person is guilty of criminal possession of a weapon in the third degree when he or she "possesses any . . . dangerous knife . . . or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another" (Penal Law § 265.01 [2]) and such person "has been previously convicted of any crime" (Penal Law § 265.02 [1]; see People v Gonzalez, 64 AD3d 1038, 1040 [2009], lv denied 13 NY3d 796 [2009]).[2]  Finally, "[a] person is guilty of unlawful imprisonment in the second degree when he [or she] restrains another person" (Penal Law § 135.05; see People v Haardt, 129 AD3d 1322, 1323 [2015]), and one commits menacing in the second degree when "[h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a . . . dangerous instrument" (Penal Law § 120.14 [1]; see People v Colon, 116 AD3d 1234, 1238 [2014], lv denied 24 NY3d 959 [2014]).  A defendant's intent to commit a particular offense "may be

---

[2]  Defendant was arraigned on a special information alleging that he previously had been convicted of the crime of criminal trespass in the second degree and admitted the prior conviction; hence, this element of the offense was established (see People v Wright, 134 AD3d 1299, 1300 [2015]).

inferred from [his or her] conduct and from the surrounding circumstances" (People v Knox, 137 AD3d 1330, 1331 [2016] [internal quotation marks and citation omitted], lv denied ___ NY3d ___ [May 4, 2016]; see People v Carte, 113 AD3d 191, 195 [2013], lv denied 23 NY3d 1035 [2014]).

The record reflects that, on the evening of May 4, 2013, the victim went to a friend's house where she consumed "four or five of the 24-ounce cans" of Keystone Ice beer. The victim's friend eventually grew tired, but the victim wanted to continue drinking, so she called a cab with the intention of going to visit another friend. While she was waiting outside for the cab to arrive (by then the early morning hours of May 5, 2013), the victim noticed defendant standing nearby. The victim testified that she had seen — and had engaged in brief conversations with — defendant, whom she knew as Dre, prior to this date as they "both associate[d] with the same people." When the cab finally arrived, the victim, who acknowledged that she "was pretty loaded" at this point, entered the cab — as did defendant. The victim provided the cab driver with the address of her friend and, approximately 15 minutes later, arrived at the intended destination. The victim then exited the cab and "just left" — apparently paying no attention to defendant's whereabouts.

When the victim discovered that her friend was not at home, she called yet another friend and, finding that person awake, started walking to her friend's house to "drink more beer" — stopping along the way at a Getty gas station to purchase additional alcoholic beverages. The Getty station was closed but, while there, the victim again saw defendant. The victim then walked to a nearby Lukoil gas station where she successfully purchased more beer. When the victim exited that gas station, defendant was standing outside and asked her "[t]o go to his house to party." The victim, who denied having a prior sexual relationship with defendant, walked away and "bl[ew] him off," but defendant continued to follow her and attempted to persuade

her "to go to his house."[3]  When the victim told defendant to
"f*** off" and tried to walk away, defendant grabbed the victim
from behind by her neck and a struggle ensued.  As the victim
continued to struggle, defendant pushed her down a driveway
separating two nearby residences – forcing her to the rear of the
property.

The victim testified that after she and defendant
disappeared from the view of the street surveillance camera,
defendant "started to get more violent."  Specifically, the
victim stated that defendant "picked [her] up by [her] neck and
started to strangle [her] for quite a bit of time, hard enough to
where [she] couldn't breathe anymore, and . . . long enough [to]
where [she] thought [she] was going to die" and could feel her
"eyes popping out of [her] head."  At that point, defendant "let
go" and the victim fell to her knees – "coughing . . . really
hard," "spitting up a whole bunch of phlegm" and "trying to [be]
able to breathe again."  Defendant continued to push the victim
toward the rear of the property and, when the victim "tried to
get away," defendant grabbed her by the arm so hard that she
thought that her "arm was going to break."  The victim begged
defendant to stop, in response to which defendant told the victim
to "shut up" or he would kill her.

Upon reaching the rear of the property, defendant and the
victim were – as the victim described it – "blocked in," at which
point – the victim testified – defendant started walking her back
toward the street.  En route, defendant stopped, threw the victim
against the wall of a residence, began choking her again and, at
some point, pulled out a knife and stabbed her in the leg.  As
the victim "slouched down," defendant punched her in the side of
the head "really, really hard" – causing her to "s[ee] stars" and

_____

[3]  Video surveillance from a nearby street camera depicts
the victim and defendant walking side-by-side for approximately
seven minutes and, during a portion of this time, the victim is
observed holding defendant's long-sleeve shirt in her hands.

feel "discombobulated."  Thereafter, while holding the victim against the wall with one hand, defendant unzipped his pants with the other and forced the victim to perform oral sex.[4]  When he was finished, defendant grabbed the victim by the neck and dragged her across the street to a nearby parking lot.  As defendant and the victim were crossing the parking lot, they observed a police car; in response, defendant loosened his grip and the victim ran away.

The victim's testimony was corroborated to varying degrees by, among other things, the aforementioned video surveillance, which depicted a portion of the interaction between the victim and defendant on the morning in question, as well as the testimony of an individual who lived near the scene of the incident.  The witness testified that, while working on her computer early that morning, she heard a noise, "looked outside and . . . saw a woman crying and this bigger man, African-American man, . . . grabbing her forearms . . . [and] pulling her out of . . . view."  According to this witness, the woman was "sobbing," "had an obvious look of distress on her face" and was "pulling back" from her assailant.  The witness further testified that, as this encounter unfolded, she heard the woman say "No." In response, the witness made two phone calls to 911, and members of the City of Schenectady Police Department thereafter arrived at the scene.  One of the responding officers recovered a knife from defendant's person, and another testified that defendant, while still at the scene of the incident, admitted to engaging in a sexual encounter with the victim and to placing his hands around the victim's neck and choking her — with defendant claiming that the victim "offered to give a blowjob for money," that "he was [only] guilty of getting some head" and that "he

_____

[4]  The victim testified that she did not consent, nor did she offer to perform oral sex in exchange for either money or beer.

could have swor[n] that she said to . . . choke her."[5]  Testimony also was adduced from the medical personnel who treated the victim following this incident.  In addition to the foregoing, audio recordings of defendant's statements to officers at the scene, together with the transcripts thereof, as well as photographs taken of both the victim and the scene following this incident and the victim's medical records, were received into evidence.

Contrary to defendant's assertion, we are satisfied that his conviction of strangulation in the second degree as a sexually motivated felony is supported by legally sufficient evidence.  As to defendant's weight of the evidence claims, although a different verdict would not have been unreasonable, we find — upon reviewing the evidence previously discussed and granting deference to the jury's credibility determinations — that the jury's verdict as to each of the sustained charges is in accord with the weight of the evidence adduced at trial.  Specifically, the testimony of the victim, wherein she described the manner in which defendant grabbed, dragged, restrained and choked her, threatened her with a knife and compelled her to perform oral sex, together with the video surveillance footage, the photographic evidence, the medical evidence, the testimony offered by the witness who heard the victim sobbing and saw her pull back from her assailant, the testimony of the responding

---

[5]  Defendant offered a contrary version of these events after he was advised of his rights and interviewed at the police station, at which time he denied that he had engaged in oral sex with the victim on the morning in question.  Although admitting that he had engaged in sexual encounters with the victim on "several different occasions" in the past and that he entered the alley that morning for the purpose of getting a "blowjob," he insisted that "nothing happened" — he and the victim did not have sex, he did not choke her and he did not pull a knife on her — because the victim was "bugging out" about going to meet some "trick."

officers, the knife recovered from defendant's person and defendant's admission that he and the victim engaged in a sexual encounter and that he choked her, established each of the required elements of predatory sexual assault, strangulation in the second degree as a sexually motivated felony, criminal sexual act in the first degree, criminal possession of a weapon in the third degree, unlawful imprisonment in the second degree and menacing in the second degree.

That said, we find merit to defendant's claim that he was deprived of a fair trial due to County Court's erroneous Molineux ruling – specifically, the court's decision to permit the People to introduce evidence on their case-in-chief of a prior alleged sexual assault perpetrated by defendant against another woman (hereinafter the previous victim) in May 2011. Prior to trial, and in the context of their Sandoval application, the People sought to introduce proof of defendant's 2011 conviction of assault in the third degree – a conviction that had its genesis in the alleged sexual assault of the previous victim.[6] County Court fashioned a Sandoval compromise – advising the People that, if defendant elected to testify, the People could use this conviction for impeachment purposes on cross-examination, but they would not be permitted to inquire as to the underlying facts. The People also, however, sought to utilize those underlying facts in the context of their Molineux application – seeking to introduce evidence on their case-in-chief that, in May 2011, defendant sexually assaulted the previous victim in a remarkably similar fashion as the manner in which he attacked the victim here. In so doing, the People argued that such proof was relevant to the issues of identity, modus operandi, intent and lack of consent. Defendant opposed the People's application, contending that such proof did not fall within any of the

---

[6] The record suggests that defendant was not charged with any sex-related offenses relative to the 2011 incident; rather, it appears that defendant was charged with and pleaded guilty to only assault in the third degree.

recognized Molineux exceptions and, in any event, that the probative value of such evidence was vastly exceeded by its prejudicial effect. Although acknowledging that it was "a close call," County Court granted the People's Molineux application on this point, finding that such proof was probative of identity, intent and lack of consent. As a result, the People called the previous victim to testify as part of their case-in-chief.

Once on the stand, the previous victim recounted — at length and over defendant's continued objection — the details of her May 12, 2011 encounter with defendant. Specifically, the previous victim testified that, on the day in question, she and defendant, who were "friends with benefits," were hanging out in the hotel room where defendant then lived on Central Avenue in the Town of Colonie, Albany County. According to the previous victim, the plan was to "have sex first, then drink, then go to sleep." After taking a break to purchase more beer, the previous victim and defendant returned to the hotel room — where defendant expressed his desire to again engage in sex. The previous victim testified that when she rebuffed defendant's overtures, defendant "became angry"; as she started to leave the room, defendant hit her "upside [her] head and . . . knocked [her] to the floor." According to the previous victim, defendant then straddled her — as she was lying face down on the floor — and continued to hit her face and head. When she rolled onto her back, defendant allegedly covered her mouth and nose with his hands, placed his hands across her throat, "pulled out a knife," held the knife to her face and said that he was going to kill her. The previous victim testified that this encounter lasted approximately two hours, during which time she attempted to engage in sexual activity with defendant in an unsuccessful effort to appease him. Eventually, the previous victim "jumped up, grabbed [her] clothes and ran out the door, naked, onto Central Avenue." Law enforcement was notified, defendant was arrested and the resulting plea to assault in the third degree followed. In addition to the previous victim's testimony, County Court allowed the People to enter into evidence — again over defendant's

objection — photographs taken shortly after this incident, which depicted the injuries that she had sustained.

Subject to certain limitations imposed by the trial court, Sandoval permits the People to use "prior convictions or proof of the prior commission of specific criminal, vicious or immoral acts for the purpose of impeaching a defendant's credibility" on cross-examination — should such defendant elect to take the stand and testify at trial (People v Sandoval, 34 NY2d 371, 374 [1974]).  Molineux, on the other hand, allows the People to introduce on their case-in-chief evidence of a defendant's prior uncharged crimes or bad acts — assuming, among other things and as a threshold matter, that such proof falls within one of the recognized Molineux exceptions (see People v Molineux, 168 NY 264, 293 [1901]).  Although evidence proffered under Sandoval and Molineux serves distinctly different purposes and is admissible in equally different fashions, the overarching inquiry and analysis is the same — namely, whether the probative value of such evidence outweighs its prejudicial effect.  Despite the dissimilarities as to the manner in which the proffered evidence may be admissible at trial under Sandoval or Molineux — or perhaps because the same balancing test must occur in either instance — there does not appear to be any prohibition against allowing the People to utilize the same criminal transaction as the basis for both its Sandoval and Molineux applications (see generally People v Robinson, 239 AD2d 258 [1997]).  The problem in this case arose not as a result of the People's dual use of defendant's encounter with the previous victim but, rather, was occasioned by County Court's ruling with respect to the People's Molineux proffer.  Simply put, "the protections afforded by [County Court's] Sandoval ruling were largely eviscerated by the court's [decision to] allow[] this evidence on the People's direct case" (id. at 259).

"Evidence of similar uncharged crimes has probative value, but as a general rule it is excluded for policy reasons because it may induce the jury to base a finding of guilt on collateral

matters or to convict a defendant because of his or her past"
(<u>People v Nicholas</u>, 130 AD3d 1314, 1316 [2015] [internal
quotation marks, brackets and citations omitted]; <u>accord</u> <u>People v
Magee</u>, 135 AD3d 1176, 1181 [2016]).  That said, "evidence of
uncharged crimes or prior bad acts may be admitted where they
fall within the recognized <u>Molineux</u> exceptions — motive, intent,
absence of mistake, common plan or scheme and identity — or where
such proof is inextricably interwoven with the charged crimes,
provides necessary background or completes a witness's narrative
and, further, the trial court determines that the probative value
of such evidence outweighs is prejudicial effect" (<u>People v
Rivera</u>, 124 AD3d 1070, 1073 [2015] [internal quotation marks,
brackets, ellipsis and citations omitted], <u>lvs denied</u> 26 NY3d 971
[2015]).  Here, even assuming, without deciding, that the
previous victim's testimony at trial and the corresponding
photographs fall within one or more of the aforementioned
<u>Molineux</u> exceptions, we agree with defendant that the prejudicial
effect of such evidence far outweighs its probative value and,
therefore, the People should not have been permitted to introduce
such evidence on their case-in-chief.

The prosecutor herself acknowledged that there were
"striking similarities" between the incident involving the victim
here and the incident in the hotel room involving the previous
victim and, while it is true that a defendant cannot seek to
preclude relevant and probative evidence simply because it
demonstrates that he or she has a tendency to commit certain
crimes in a particular fashion, the prejudice posed by the
previous victim's testimony here is manifest.  To be sure, there
is no question — given the video footage obtained from the street
camera — that defendant and the victim were together on the
morning in question and — in light of defendant's admissions to
the responding officers — that he and the victim engaged in a
sexual act at that time.  However, the precise nature of that
sexual act, i.e., whether it was consensual or was procured by
forcible compulsion, was one of the key issues for the jury to
resolve — an issue that, in turn, hinged largely upon the

credibility of the victim.  Although the jury chose to credit the victim's account of the events that had transpired that morning (and we defer to the jury on this point), the fact remains that there were certain inconsistencies in the victim's testimony — inconsistencies that the jury may well have discounted upon hearing the previous victim's testimony that she, too, was the victim of a very similar sexual assault that purportedly was perpetrated by defendant.  In other words, whatever doubts the jury may have had regarding the victim's credibility may have been laid to rest once they were presented with additional proof that, in sum and substance, defendant had a propensity — when his sexual advances were rejected — to turn violent, choke, pull a knife on and forcibly compel his partners to engage in sexual activity.  To our analysis, the previous victim's testimony was highly prejudicial, as it related to a relatively recent prior bad act that was nearly identical to the incident underlying the crimes for which defendant was on trial.  Hence, County Court erred in permitting the People to proffer such proof on their case-in-chief.  Further, in light of the fact that this case largely centered upon the credibility of the victim, "we cannot characterize the error in admitting this evidence as harmless, notwithstanding County Court's [limiting] instruction[s]" (People v Magee, 135 AD3d at 1181).  Accordingly, we must reverse the judgment of conviction and remit this matter for a new trial.[7]

Finally, given our remittal, defendant's asserted Batson violation, his claim that — once he was convicted of predatory sexual assault — his conviction of criminal sexual act in the first degree should have been dismissed as a lesser inclusory concurrent offense and his challenge to the sentence imposed as harsh and excessive are academic.  Defendant's remaining contentions, including those addressed to certain of County Court's evidentiary rulings, have been examined and found to be

---

[7]  The exclusion of such proof does not alter our weight of the evidence analysis.  Hence, defendant is entitled to a new trial, not dismissal of the indictment.

lacking in merit.

Lahtinen, J.P., Lynch, Devine and Mulvey, JJ., concur.

ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Schenectady County for a new trial.

ENTER:

*Robert D Mayberger*

Robert D. Mayberger
Clerk of the Court